**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **CASE. NO. 23-cr-223-TSC** |
| | : | |
| | : | |
| **JOSE EDUARDO VELASQUEZ** | : | |
| **(aka JOSE VALAZQUEZ, aka JOSE** | : | |
| **VALASQUEZ),** | : | |
| **Defendant.** | : | |

## UNITED STATES' SENTENCING MEMORANDUM

The United States, by and through its attorney, the United States Attorney for the District

of Columbia, respectfully files this memorandum to aid the Court in sentencing the defendant, Jose

Velasquez.  For seeking to sexually abuse a young teen for the second time in two years, the United

States is requesting that the Court sentence the defendant to 160 months incarceration, followed

by a lifetime of supervised release.  Such a sentence, which is in the middle of the Defendant's

Sentencing Guidelines Range, balances the factors outlined in 18 U.S.C. § 3553(a), is "sufficient,

but not greater than necessary to comply with the purposes of sentencing," and will provide long-

term protection to the community from potential future crimes by the defendant.

### I.     Background

For almost a month in November and December of 2020, the defendant, Jose Velasquez,

sexually pursued a person whom he believed was a 14-year-old girl named "Alexis," offering to

pay her $200 to "to do sex."  Over that month the defendant, who is presently a 60-year-old man,

made efforts to seduce this girl, telling her that she was "beautiful," sending emoji flowers, and

sending her an image of a penis penetrating a vagina in an apparent effort to entice her sexually.

In his attempts to sexually abuse an underage girl, the defendant repeatedly attempted to schedule

times to meet her for sex, drove across state lines at least twice for such a meeting, and made multiple attempts to convince her to travel to him in Maryland to have sex on his turf.  He was persistent in his pursuit of this girl, despite having every reason to believe that she was 14 years old, in ninth grade, and living at home with her mom.   And the defendant likely would have succeeded in his pursuit had it not been for the fact that 14-year-old "Alexis" was really an undercover law enforcement officer.  And, as predatory as the defendant's conduct in the instant case was, it is made all the more troubling given that, at the time of this offense, he was on probation in Maryland for a crime involving substantially the same conduct.

Beginning on November 16, 2020, an undercover officer ("UC") assigned to the Federal Bureau of Investigation/Metropolitan Police Department ("FBI/MPD") Child Exploitation and Human Trafficking Task Force ("CEHTTF") began conversing with the defendant, Jose Velasquez, using the social media platform "Tagged."  Tagged  was originally created or marketed as an adult dating application, on which adults could view the profiles of other adults and initiate conversations.  As is the case with many dating applications, or "apps", Tagged has evolved into a platform for people seeking sexual encounters with others.  The Tagged platform allows the user to create a profile by entering a date of birth which does not require any validation, allowing children to access the app and seek out or be sought by others.  The platform has become known as a place where vulnerable children can be found and solicited for sexual activity.  The platform allows any user to seek out the profiles of people in their area, and allows those users to see both the biographical information of the user and the picture used in the profile.  Any user, specifically an adult, can then reach out by message to the individual whose profile they have viewed and want to initiate communication with.  This allows predatory adults to troll the app for possible juveniles and engage them in conversation, in order to groom them and facilitate potential meetings for sex.

On Tagged, using an account bearing the username "Jose E V," the defendant initiated a conversation with the UC by sending a message to the effect of "I really like you" in Spanish.  The conversation continued as follows:

> UC:  Hey! [smiling-face emoji]
> Defendant:  Hey what's up how you doing
> Defendant:  My name is Ed nice to meet you.
> UC:  I'm doing good
> UC:  My name is Alexis
> Defendant:  Nice you like a princess you so beautiful
> Defendant:  I'm looking for a little bit of fun if you're interesting I give you $200
> Defendant:  If you be with me tomorrow night.
> UC:  Definitely but I don't know if I'm what ur looking for kinda young.
> Defendant :  ???
> UC:  I would be willing what you want for 200
> Defendant: what you mean
> UC:  I was asking what u would want to do for the $200
> Defendant:  Baby you and [bed emoji]'
> Defendant:  Be with you in bed

The UC asked the defendant if he used another messaging platform.  The defendant asked for the UC's phone number, and the conversation continued.  They discussed when they could meet up, and the UC asked what would have to be done for the $200.  The defendant responded, "What's your number I'm not telling you on here."  The UC then provided the defendant with an undercover phone number.

The conversation subsequently moved to a law enforcement-based messaging and calling application, where they continued discussing when to meet up.  The UC stated, "My mom works tomorrow night so she won't no what im doing."  The defendant responded, "Nice so we can do it tomorrow night."  The conversation continued:

> Defendant:  Yeah I come to pick you up after work that okay
> UC:  Well want to no what u want for the 200 first
> Defendant:  I mean are you good in bed
> Defendant:  We going to do sex

UC:  Ok and I think I am haven't been wiyh a lot of guys to be honest I'm only 14
 Defendant:  ?
UC:  Just saying ive been wiyh a few boys but thought I was ok
UC:  Just wanted to make sure you cool with me being 14 I know kinda young
Defendant:  Well I don't know
UC:  Ok that's why I wanted to tell you
Defendant:  Not sure show me your p****
 UC:  No told u I don't do that
Defendant:  Okay if you don't do that it's because your police
Defendant:  ?
UC:  What? Im not the police
Defendant:  Okay I trust you no problem
Defendant:  Where can I meet you

The defendant then arranged with the UC to meet in Northwest, Washington, D.C. the following day after he got off work at 5:00 p.m.  The UC told the defendant the UC would provide the address after the UC's mother went to work.  The defendant replied, "Yeah no problem I love so sweet."  The defendant sent flower emojis and kiss emojis.

The following morning, on November 17, 2020, the defendant sent the UC a message at 7:32 a.m. stating, "Good morning princess" along with a picture of a rose.  He later wrote, "I'm happy that you're going to be mine so how are you this morning."  The UC responded "Doing good tired! Getting ready for classes [eye rolling emoji]."  Later in the conversation, the defendant asked how the UC does school online.

At approximately 4:48 p.m., the defendant messaged the UC, "Hey baby how are you how was your day."  The UC explained that the UC hated not being with friends and stated, "No 9th grade is all online [rolling eye emoji] terrible first year of HS."  The defendant explained that his day was cold outside and then asked, "So can you tell me your address."  The UC responded, "I was thinking today you going to wear a condom because im not getting pregnant at 14."  The defendant replied, "Yeah yeah baby always no problems yeah I have condoms."  The defendant advised that he would be waiting for the UC's mom to leave.

A short time later, the UC gave the defendant the meeting address and indicated that the UC's mom had left for the day. Approximately twenty-five to thirty minutes later, the defendant contacted the UC and explained that he had a flat tire on I-395—a route that one could take if traveling to Washington D.C. from Virginia. The defendant explained that he still wanted to meet with her, at one point stating, "Yeah I need at least 5 hours with you maybe we can do Friday cuz you can spend the night right." The UC responded, "I can't spend the night my dad or mom would never let me at 14." The defendant later stated, "If you tell them you're going to be spending the night in friends house like sleepover can you do that." The UC explained how the UC would get caught if the UC did so.

The defendant went on to talk about his car troubles and what he needed to do to fix the issue and stated, "I'll be on time tomorrow if you if she work[.]" The defendant sent kiss emojis and roses and stated, "You so sweet baby I like you I want you be mine."

The UC later advised that the UC's mother worked the next evening and arranged to meet the defendant the following day. The defendant asked numerous questions about what times the UC's mother got off work and asked to spend two to four hours with the UC. He also asked if the UC had school. The defendant stated that he was coming from Solomons Island, a town in Calvert County, Maryland, approximately one and a half hours from Washington, D.C. by car. The defendant asked about getting a motel or whether the UC would come to the defendant's house, both of which would be located outside of the District of Columbia. The UC stated that the UC felt more comfortable at the UC's house. The defendant reported that he always does a motel but that he trusted the UC. The conversation continued with the defendant asking for full body pictures of the UC. The defendant sent a picture of himself with a chain saw and his foot on a tree and explained that was what he does, an apparent reference to his profession.

The following morning, on November 18, 2020, at 8:26 a.m., the defendant sent the UC a message stating, "Good night my princess" and "Hi good morning, [kiss face emoji]." The defendant said that he missed the UC the previous night and then stated, "No no no really a dreaming with you I have a wet dream my underworx was wet this morning [sad face emoji]."

Later that day, the UC contacted the defendant to determine if he still wanted to meet that night. The defendant stated that he was getting his car, which had been fixed, and wanted to pick the UC up. He stated that he did not want to go to the UC's house and wanted to go to a motel. The UC asked, "Ok u still going to give me $200 for sex." The defendant replied, "Yes baby of course that's your money." They made arrangements to meet at 6:00 p.m.

At approximately 4:30 p.m., 90 minutes earlier than the prearranged meeting, the defendant advised that he was at the meeting location and sent a screenshot of an online map depicting the location. The defendant asked the UC to come out to meet. The UC told the defendant that the UC was out with the UC's mother and would be there at the prearranged meeting time, 6:00 p.m. The defendant told the UC that he was nervous.

At approximately 5:30 p.m., the UC advised that the UC's mother had left and asked if the defendant was still in front of the location. The defendant advised that he had gone to a restaurant located near the meeting location. The defendant said that he had left because there were too many police in the area, and he did not want to meet at that location anymore. The defendant then asked the UC to take an Uber in order to meet to have sex, stating:

> Defendant: If you want to I can pay you the Uber then bring you to my place
> UC: What motel
> Defendant: Yes at the motel
> UC: Where
> UC: U trying to trick me?
> Defendant: No baby I can't trick you and I'm scared you know to do this too I was carefully that's why I left to play it was like four kind of police you know around the building so if you want to do that way I can lover you too to the hotel

UC:  Why would police care about me getting in your car?
Defendant:  I really really I want you back I don't want to be in problems I have enough problems so if you want to do it I'll call over to my directions and you come to my place
Defendant:  I don't know it should ask them
UC:  Thats fine i don't want you to get in trouble and if you dont want to then its ok
Defendant:  I'm going to go uver [Uber] for you okay
UC:  [Emoji]
Defendant:  Yes baby I called an Uber for you

The defendant and the UC ultimately ended the conversation with no arrangement to meet.

A short time later, the defendant sent a message stating, "Look what you miss 200$?[,]" followed by a picture of a female being vaginally penetrated by a penis.  The defendant then sent a message stating, "Maybe next time when you can." The UC replied, "Wow (smile emoji)."  The defendant and the UC spoke about sex, and the defendant stated, "Got my dick so hard now come on baby let's do it."  The conversation continued:

UC:  U want me to go back to the apartment u coming
Defendant:  No I want you to come to my apartment
UC:  Is it close to a metro
Defendant:  Yeah very close I can meet you at the metro
UC:  Ok we pick a day and do that
UC:  What metro?
Defendant:  Okay take the metro to Greenville
UC:  Greenville?
Defendant:  No Greenbelt [Greenbelt, Maryland]
Defendant:  Sorry I spelled wrong

The UC and defendant were not able to agree on a time, so did not meet on November 18, 2020.

In the following days, the defendant and the UC continued to communicate.  The defendant at times sent pictures of flowers and said how beautiful the UC was.  On Friday, November 20th, 2020, the defendant advised that he wanted to meet the UC in Maryland or Arlington, Virginia, because of all the police in Washington, D.C.  The UC asked how the police would know anything, and the defendant replied, "Because they know we text on the phone"; "When we send the address

7

they know where we are"; and "You know they control their phones."  The UC replied, "That's crazy" and told the defendant to "[g]et Kik then and we talk there."  The defendant asked for the UC's Kik username.  The conversation then moved to "Kik," which is another messaging application.

Between November 20th and November 29th, 2020, the defendant and the UC had several conversations about possible meetings and the upcoming holiday.  On November 30, 2020, the defendant texted the UC that he wanted to see the UC, to which the UC responded, "Oh I'm in class today you still off tomorrow."  The defendant and UC talked about meeting the following day and agreed to meet at the original meeting location.  The defendant asked the UC to walk a couple blocks from the location.  The conversation continued:

> UC:  why? Just pick me up in front.
> Defendant:  Yo baby I can't do that remember last time I was a lot of cops in there so I prefer you walk
> Defendant:  I'll pick you up from the street
> UC:  This is crazy just forget it if you don't want to I understand you nervous because I'm 14 I get it
> UC:  We're not having sex in front of the police
> Defendant:  Let's try one more time okay if it's not work we need to do something else
> UC:  I already waited around twice so last time ok
> Defendant:  yes yes

The conversation later continued:

> UC:  I want to no what u want for that $200
> Defendant:  I want p**** and a****** can you do that
> UC:  Never done a****** but will you go slow
> Defendant:  yes baby of course
> Defendant:  Got my dick is so hard right now
> UC:  [smile emoji]
> Defendant:  Can I see you p****
> UC:  Tomorrow! I'm in class
> UC:  Don't forget you have to wear a condom ok
> Defendant:  Go to the bathroom and send me a picture
> UC:  No I'm not putting my p**** on pics I told u already exposed once last year in 8th grade

Defendant:  Okay see you tomorrow then love you just be careful sweet I guess you wet right now
UC:  I really am! [smile emoji]
Defendant:  I going to suck the little p**** very good see you later

On December 1, 2020, the defendant did not arrive at the location that he and the UC arranged.  The UC sent messages that were never returned and did not appear to have been read. The defendant later contacted the UC on December 6, 2020, explaining that his boss made him go down to Florida, which is why he missed the arranged meeting.

On December 14, 2020, the defendant contacted the UC and asked if the UC was going to school that day.  He explained that he did not have to work due to the weather and asked if he could pick the UC up that afternoon.  The UC told the defendant that he could pick the UC up at 2:30 that day.  The UC asked the defendant, "How much will u give me if we meet today"?  The conversation later continued:

UC:  You didn't say how much u r giving me today
Defendant:  200$
UC:  What you want so I know
Defendant:  What you mean I don't get it
UC:  What you want for the $200?  So I know
Defendant:  I want everything
UC:  Ok you going to wear a condom right
Defendant:  Yes bb
UC:  Ok its raining so pick me up in front of school so don't get [wet]
Defendant:  No thank you I'm not this kind of stupid if you want to do it you have to walk out of school
UC:  Yes u cant come in the school
UC:  I'll get in your car
Defendant:  I don't even go in front of the school that's too many cameras on there I'm sorry you have to walk at least one two block from the school so the other way I think you trying to trick me sorry it's no deal like that if you want to do it do what I say or nothing

The defendant and the UC continued to discuss the logistics of the pickup.  When the UC asked what car the defendant would be arriving in, he refused to tell the UC, stating that he would not tell the UC until he saw the UC.  The UC told the defendant that he was making the UC nervous

and asked why he was behaving this way.  The defendant said, "Because I want you I don't want nothing to happen to us I want to make sure we do the right thing."

At approximately 2:26 p.m., the defendant asked the UC if the UC could walk up to 19th and C Street Northeast.  Members of law enforcement were able to locate the defendant near the corner of 19th and C Streets Northeast, operating a Toyota Corolla bearing a Maryland temporary tag that was immediately behind a car operated by law enforcement.  The defendant was stopped and placed under arrest at 15th and C Streets Northeast.  In the center console of the vehicle law enforcement recovered a call phone displaying the most recent chats between the defendant and the UC.  In the defendant's phone, the UC was listed as a contact named "Mi Novia"—i.e., "My Girlfriend" in Spanish.

On December 15, 2023, the defendant entered a plea of guilty to one count of Coercion and Enticement, in violation of 18 U.S.C. § 2422(a).  Sentencing is scheduled for March 18, 2024.

## II.     A Sentence at the Mid-Range of the Defendant's Sentencing Guidelines Appropriately Reflects the § 3553(a) Factors

In determining a reasonable sentence, the Court must consider the factors listed in 18 U.S.C. § 3553(a).[1]  These factors include:

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;

(2) the need for the sentence imposed –

    (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

    (B) to afford adequate deterrence to criminal conduct;

    (C) to protect the public from further crimes of the defendant; and

    (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner; and

(3) the kinds of sentences available;

---

[1] "Since the Supreme Court's decision in *United States v. Booker*, 543 U.S. 220, 125 S. Ct. 738, 160 L.Ed.2d 621 (2005), the Guidelines serve only an advisory function. *Id.* at 245, 125 S. Ct. 738. Nevertheless, even in a post-*Booker* world in which the Guidelines are not binding, the sentencing court 'must calculate and consider the applicable Guidelines range" as its starting point.

(4) the applicable sentencing guidelines range for the offense;

(5) pertinent policy statements issued by the U.S. Sentencing Commission;

(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7) the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a); *see also United States v. Pyles*, No. CR 14-00006 (RJL), 2020 WL 376787, at *2 (D.D.C. Jan. 23, 2020); *United States v. Mitchell*, No. CR 05-00110 (EGS), 2019 WL 2647571, at *7 (D.D.C. June 27, 2019). A district court, however, "need not consider every § 3553(a) factor in every case." *In re Sealed Case*, 527 F.3d 188, 191 (D.C. Cir. 2008); *see also United States v. Fry*, 851 F.3d 1329, 1332 (D.C. Cir. 2017).

Here, the United States submits that a sentence of 160 months, at the middle of the defendant's Sentencing Guidelines' range, reasonably accounts for the factors established in § 3553.

### A. The Nature and Circumstances of the Offense

The serious nature of defendant Velasquez's conduct, in which he persistently pursued a sexual encounter with a person whom he had every reason to believe was a young teen, weighs in favor of sentence compliant with his Sentencing Guideline's range. The defendant was repeatedly told that the girl was only 14 years old and her young age was a regular topic of their chats, including her experiences as a ninth grader in high school, as well as the fact that she lived with her mom. Despite her age – and the defendant's clear knowledge that a 14-year-old should be off limits sexually – the defendant offered this girl $200 to "to do sex," repeatedly confirming that he would pay her for a sexual encounter. In addition to pursuing her sexually and offering money, the defendant also attempted on several occasions to persuade this girl to travel to meet him either at a hotel or at another location. He even traveled from outside of the District of Columbia on at least two separate occasions in an attempt to meet with this girl in person.

The defendant's persistence – all while knowing full well that sex with a teenager was illegal – is very troubling.  It shows, first, a brazen contempt for the law, as exemplified by his references to avoiding detection by law enforcement in their chats and his avoidance of an area with police officers during an attempted meet.  Second, the defendant's conduct shows an utter disregard for the wellbeing of a minor.  The defendant had multiple opportunities to end contact with her or to make a different choice, but he persisted over almost a month in attempting to have sex with a 14-year-old. But for the fact that an undercover officer was on the other end of his chats, the defendant likely would have succeeded in his efforts to pay for sex with minor.  Such conduct is a danger to vulnerable teens in the community – teens who may need money, lack stability and protection, or who do not have caring adults to guide them into making healthy choices – and weighs in favor of a substantial sentence.

### B. History and Characteristics of the Defendant

One of the most troubling aspects of the defendant's conduct is that this is not the first time that he has sought out a sexual encounter with a minor.  This fact alone weighs in favor of a lengthy sentence, within the Sentencing Guidelines range. Just two years prior to the instant offense, the defendant engaged in eerily similar conduct with person he believed was 14 years old. As described in the Presentence Report, on December 13, 2018, the defendant contacted someone via social media who had the profile picture of an adult female teen.  The individual, who happened to be an undercover officer in Maryland, indicated that she was only 14 years old.  Even after receiving that information, the defendant pursued a sexual encounter with the girl, writing "It's OK if you want to do it if you need money to help you I'm not going to hurt you I want to do easy." "Anything if you don't want the whole thing or jus a little bit.  Just do a little bit just head."  Draft PSR at ¶

60, ECF No. 81.  The defendant was then arrested when he confirmed that he was waiting for the girl in the park.

Following his arrest, defendant Velasquez then pled guilty to one count of Sexual Solicitation of a Minor in the Circuit Court for Howard County Maryland.  He was sentenced on September 5, 2019, to two years of custody, with all but six months suspended, followed by three years of supervised probation.  Significantly, he was still on probation in Howard County, Maryland, when he was arrested for strikingly similar conduct in this case.  Cleary, the defendant's sentence and probation in Maryland did little to deter him from seeking out young teens for sex, a fact that suggests that a sentence within the Sentencing Guideline's range is necessary to protect the public from future crimes of the defendant.

In addition, the defendant's prior convictions for Driving Under the Influence of Alcohol (2011), Contributing to Delinquency of Minor (2013), Driving While Intoxicated, Second Offense (2019), and Drunk in Public (2019) suggests a pattern of long-term alcohol abuse.  PSR at ¶¶ 58-62, ECF No. 81.  While there is no evidence connecting the defendant's use of alcohol with the crime in this case, a sentence that includes an alcohol treatment component may assist the defendant's overall rehabilitation.

A sentence of 160 months incarceration, which is compliant with the Sentencing Guidelines, appropriately balances the § 3553 factors by taking into account the defendant's history as someone who has now twice attempted to have sex with a teen for money.

## C. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense, to Promote Respect for the Law, and Provide Just Punishment for the Offense

This factor is known as the "just desserts" concept, answering the need for retribution so that the punishment fits the crime and the defendant is punished justly.  *See United States v. Irey*,

612 F.3d 1160, 1206 (11th Cir. 2010).   The *Irey* court cited the Senate Report regarding this provision:

> This purpose--essentially the "just desserts" concept--should be reflected clearly in all sentences; it is another way of saying that the sentence should reflect the gravity of the defendant's conduct.  From the public's standpoint, the sentence should be of a type and length that will adequately reflect, among other things, the harm done or threatened by the offense, and the public interest in preventing a recurrence of the offense.   (quoting S.Rep. No. 98-225, at 75-76, 1984 U.S.C.C.A.N. 3258-59).

*Id.*

The sexual abuse of minors is a serious offense that can have detrimental effects on the victim both in the long and short term. While the defendant's conduct did not involve the actual exploitation of a vulnerable teen, that was only because the defendant's intended target was an undercover officer and not a real child.  The defendant certainly did everything he could possibly do to attempt to exploit a child.  An appropriate sentence in this case should account, not only for the conduct the defendant actually engaged in, but for the conduct he was clearly intending to engage in when he traveled to the District of Columbia to engage in the sexual abuse of a minor and when he repeatedly offered his intended target money to meet him for sex.

### D.  The Need for the Sentence Imposed to Afford Adequate Deterrence and to Protect the Public from Further Crimes of the Defendant

Congress, the Supreme Court, and the Sentencing Commission believe general deterrence is a very important factor when considering an appropriate sentence.  *See United States v. Fry*, 851 F.3d 1329, 1332 (D.C. Cir. 2017) (the sentence would deter Fry and "others who may be inclined in doing similar kinds of things.").  Here, a sentence of 160 months will deter others who may be inclined to seek out vulnerable teens and aid in protecting the community from such individuals, including the defendant.  This sentence, which is at the middle of the defendant's guidelines range, is appropriate given the defendant's persistence and determination pay a teen for sex. This was not

14

a crime of opportunity or a one-time lapse in judgement.  Rather, the defendant chatted with the undercover agent over for almost a month and ultimately traveled to the District of Columbia at least two times to attempt meet with a person he believed was a minor. Therefore, the defendant's conduct is particularly dangerous and warrants a significant sentence.

### E. The Need to Avoid Unwarranted Sentence Disparities among Defendants with Similar Records Who Have been Found Guilty of Similar Conduct

Section 3553(a)(6) directs courts to consider avoiding *unwarranted* disparities among defendants "with similar records who have been found guilty of similar conduct." It "does not require the district court to avoid sentencing disparities between defendants who might not be similarly situated." *United States v. Mattea*, 895 F.3d 762, 768 (D.C. Cir. 2018) (quoting *United States v. Guillermo Balleza*, 613 F.3d 432, 435 (5th Cir. 2010).  When an offense is uniquely serious, courts will consider the need to impose "stiffer sentences" that "justif[y] the risk of potential disparities." *United States v. Jones*, 846 F.3d 366, 372 (D.C. Cir. 2017); *see also United States v. Accardi*, 669 F.3d 340, 346 (D.C. Cir. 2012) (concluding that a within-Guidelines sentence for a child-pornography offense did not produce an unwarranted disparity when the images distributed by the defendant "were much more aggressive and troubling than the images distributed by other offenders" who received lesser sentences).

The United States is seeking a Guideline's compliant sentence in this case, which is warranted by the defendant's conduct and history.  The defendant pursued a girl whom he believed was only 14 years old and offered to pay her $200 for sex.  He did so persistently, chatting with this girl for almost a month and repeatedly coming to the District of Columbia to meet with her. That this conduct occurred while the defendant was on probation for substantially similar conduct in Maryland sets the defendant apart from others.  A sentence at the mid-range of his Guidelines is appropriate and does not subject him to unwarranted disparities.

**III.**    **Conclusion**

The Government submits that a sentence of 160 months incarceration, at the middle of the

defendant's Sentencing Guideline's range, is a reasonable sentence in this case and is "sufficient,

but not greater than necessary to comply with the purposes" of sentencing.  18 U.S.C. § 3553(a).

Dated:  March 8, 2024                     Respectfully submitted,


MATTHEW M. GRAVES
UNITED STATES ATTORNEY

 /s/   *Jocelyn Bond*
Jocelyn Bond, DC Bar No. 1008904
Assistant United States Attorney
601 D Street, NW
Washington, D.C. 20530